## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CRYSTAL WESTON, | ) | |
| 5337 Drake Place SE | ) | |
| Washington, DC 20019 | ) | |
| | ) | Case No.: |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| UNITED STATES | ) | |
| DEPARTMENT OF DEFENSE, | ) | |
| Lloyd Austin, Secretary | ) | |
| Serve: General Counsel of the Department | ) | |
| of Defense | ) | |
| 1235 South Clark St. | ) | |
| Suite 1540 | ) | |
| Arlington, VA 22202 | ) | |
| | ) | |
| Department of Justice | ) | |
| 950 Pennsylvania Ave. NW | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| Office of the United States Attorney | ) | |
| 57 Pennsylvania Ave. NW | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

Comes now Plaintiff, **Crystal Weston,** (hereinafter "Plaintiff" or "Ms. Weston") by and through undersigned counsel, with her Complaint against Defendant, the Department of Defense (hereinafter "Defendant" or "DOD"), and states as follows:

1

**<ins>INTRODUCTION</ins>**

Plaintiff is an African American female disabled veteran, who had a long and successful career as a Registered Nurse serving DOD personnel at the Pentagon. More specifically, because of her experience, expertise and deft touch with patients, Plaintiff was assigned to the Executive Medicine Team at the DeLorenzo Pentagon Medical Clinic. In that capacity, Plaintiff provided medical services to the most senior Pentagon personnel, as well as to the President of the United States, the Vice President and many other domestic and foreign dignitaries. Plaintiff was in that role for more than ten years without incident. Plaintiff happened to be the only African American RN in the Executive Medicine department, not just at the Pentagon, but in the entire National Capitol region.

In 2018, during the Trump Administration, a new Medical Director was assigned to the clinic who took an immediate dislike Plaintiff, and without reason or justification, decided to move her out of the Executive Medicine team and assign her to primary care. Despite her bewilderment and disappointment about the unjustified and unfair reassignment, Plaintiff excelled in her new assignment, and within a few months, was selected to be the charge, or "head" nurse for the entire department. Again, for no apparent reason, Plaintiff's success irritated the Medical Director and a newly arrived Major who was determined to carry out the Director's discriminatory schemes, and they collaborated to remove Plaintiff from the Charge Nurse role.

Plaintiff was so upset by the irrational and disparate treatment that she was being subjected to, and the fact that management ignored all of her complaints, she felt she had no choice but to file an internal EEO complaint. Thereafter, Defendant mercilessly retaliated against Plaintiff, making her work life a misery.

In December of 2019, Plaintiff fell inside the Pentagon and badly injured her knee. Rather than heeding the diagnosis and recommendations of Plaintiff's treating physician, Plaintiff's supervisor took it upon herself to diagnose Plaintiff's condition at a distance and on a hunch, and chose to disbelieve and dismiss all of the evidence regarding Plaintiff's injury. Plaintiff asked on *four separate occasions* for a reasonable accommodation of a serious injury to a leg in which she had bone grafts due to a pervious bout with bone cancer, and on each occasion Plaintiff's management refused her request, without engaging in any of the statutorily mandated steps applicable to such requests.

Defendant was not satisfied in simply harassing and demeaning Plaintiff, or in denying her basic consideration of her injuries, they collaborated to defame and malign Plaintiff, and fabricate reasons to discipline, and eventually discharge Plaintiff from her employment. Plaintiff worked for twenty (20) years at the clinic, eighteen of them without incident. In the last two years of her employment, she was targeted to be moved out because of her race and gender and engagement in protected activity.

In this Complaint, Plaintiff alleges claims pursuant to Title VII of the Civil Rights Act of 1967, 42 U.S.C. 2000e *et seq.*, and the Americans With Disabilities Act 28 U.S.C. §12111 *et seq.* (hereinafter the ADA). Because of Defendant's unlawful and unjustified actions, Plaintiff has been made to suffer both extreme physical and emotional pain and anguish. She seeks damages herein to compensate her for lost wages and benefits, damage to her reputation, and severe mental and emotional suffering of not less than $1,500,000.00, as well as all other remedies deemed appropriate by the jury.

## JURISDICTION AND VENUE

This Court enjoys jurisdiction over this matter because the Defendant is the United States of America, and because claims herein are brought pursuant to the laws of the United States. Venue is proper in this Court because all acts and omissions that form the basis of the claims herein took place in the District of Columbia.

## PARTIES

1.     Plaintiff Crystal Weston is an African American woman, and resident of the District of Columbia. For all times relevant to the Complaint, Plaintiff was a Registered Nurse employed by the Department of Defense.

2.     Department of Defense if a department of the United States Government.

## RELEVANT FACTS

3.     Plaintiff is an African American woman, who honorably served in the United States armed forces for five years before becoming a civilian employee for the Department of Defense.

4.     Plaintiff has been a licensed Registered Nurse (RN) since November 14, 2005.

5.     Ms. Weston began her federal service with DOD in June of 2002.  She has worked for the DOD for approximately twenty (20) years prior to her abrupt and unwarranted removal in June 2022.

6.     Specifically, up until 2018, Plaintiff was assigned as a nurse in the DeLorenzo Pentagon Healthcare Clinic (hereinafter "the Pentagon clinic"), where senior Pentagon staff and other

dignitaries were sent for minor medical issues, illnesses, physical exams, vaccinations and other care.

7.      This assignment was considered prestigious, because the employees in that clinic regularly came into contact with powerful people.  Personnel were selected for the Executive Medicine Team (hereinafter "EMT") at the Pentagon clinic because they were technically sound, and could be trusted to have an excellent bedside manner and unwavering discretion.

8.      Plaintiff had excelled as a nurse in the EMT at the Pentagon clinic for more than ten (10) years.

9.      In the late summer of 2018, there was a change in leadership at the Pentagon Clinic.  That was when Major Jonathan Bailey (hereinafter Maj. Bailey) (white male) became the director of medicine at the Pentagon clinic, and immediately, Plaintiff's work life and environment began to change for the worse.

10.     Plaintiff noticed right away that Maj. Bailey aligned with Donald Trump and would at times would wear the red baseball cap associated with his supporters.  Additionally, Maj. Bailey would at times insist that the small television in the EMT waiting room be tuned in to Fox News.

11.     Although Plaintiff had been a nurse for years, and had no prior disciplinary or standard of care issues, in the fall of 2018, Plaintiff's work started to be hyper-scrutinized and micromanaged at the direction of Maj. Bailey.

12.     Plaintiff was constantly second-guessed and undermined in front of her colleagues, and eventually, Maj. Bailey started to undermine Plaintiff with respect to patients, as well.

13.     In the fall of 2018, Maj. Bailey removed Plaintiff from the EMT for no apparent reason. The EMT serves the President of the United States, the Vice President, and many senior pentagon

officials and other dignitaries. The nurses assigned to the EMT have to hold a security clearance, and do not simply rotate in and out of the assignment.

14.    Plaintiff had been on the EMT from 2011 to 2018, when Maj. Bailey summarily removed her, for no reason. There was no disciplinary action or complaint against Plaintiff. When Plaintiff asked the reason for her removal, Maj. Bailey claimed it was simply to rotate someone else into the position.

15.    Plaintiff herein asserts that Maj. Bailey removed her from the EMT because of her race. At the time, Plaintiff was not only the only Black nurse in the Pentagon clinic EMT, she was the only Black nurse in the entire executive medicine organization for the National Capitol region.

16.    Importantly, despite Maj. Bailey's supposed justification of wanting to rotate nurses through the clinic, Plaintiff was the only nurse in any of the EMT clinics to be rotated out.

17.    Plaintiff was moved to primary care in the Pentagon clinic, which was an insult, and completely unjustified, racially motivated move.

18.    Despite her disappointment, Plaintiff made the best of the situation, and proved to be a superb performer in the primary care practice. She did so well, that within five months of her arrival, she was made the charge, or head nurse for the entire clinic. She served in that role for January of 2019, until the fall of that year.

19.    Plaintiff's performance evaluation for the duration of her career, and importantly for the years 2018 and 2019, were outstanding.

20.    In the late fall of 2019, Major Yessenia Sinclair (hereinafter "Maj. Sinclair") (Hispanic female) joined the Pentagon clinic staff, and things got substantially worse for Plaintiff.

21.    Soon after Maj. Sinclair's arrival, Plaintiff noticed that Maj. Sinclair was actively and intentionally harassing, micromanaging and undermining Plaintiff.

22.    Maj. Sinclair would barge into Plaintiff's office every single morning and make disparaging comments to Plaintiff, question what Plaintiff was doing, accuse Plaintiff of doing personal business while on shift, and make other false, accusatory and argumentative comments.

23.    On one occasion, Plaintiff was in her office dealing with a patient who was seeking to transfer care from one of the physicians, and because the patient was Black, Maj. Bailey assumed he was there to see Plaintiff in a personal capacity. In front of the patient, Maj. Sinclair challenged his reason for being in the office, which was both racist and completely unprofessional.

24.    Plaintiff was so disturbed by the hostile and improper behavior of Maj. Sinclair, that she sent an email to both Maj. Bailey and then Major Emilia Escueta (hereinafter "Maj. Escueta") (Asian female) about the incident.

25.    Despite complaining to her superiors about the hostile and unprofessional manner in which Maj. Sinclair was treating her, Plaintiff's complaints were ignored.

26.    In the fall of 2019, Plaintiff was removed from the Charge Nurse position for no reason whatsoever.  Plaintiff asserts that her removal was a reaction to her complaints about Maj. Sinclair's behavior.

27.    As a result of the serious and relentless hostile environment that Plaintiff was enduring, the unjustified, disparate and adverse employments actions taken against her, and management's refusal to take any action to address her concerns, in November of 2019, Plaintiff filed an EEO complaint alleging a hostile work environment, discrimination based on race and gender.  Plaintiff alleged that she was being subjected to unfair and disparate work distribution, and being unfairly singled out for assignments outside the scope of her role as Registered Nurse.

28.     On or about  December 4, 2019, Ms. Weston suffered a knee injury due to a fall just outside of the clinic entrance inside the Pentagon building.  There was inclement weather at the time, and the floor was slippery.

29.     At the time of Plaintiff's initial injury in December of 2019, Maj. Sinclair asserted to Ms. Weston that she did not believe Plaintiff was badly injured, based upon Maj. Sinclair's personal hunch and cursory review of Plaintiff's medical documentation.

30.     However, at no time did Maj. Sinclair actually examine Plaintiff, talk to Plaintiff's medical provider, or seek an opinion from a qualified third party.  Rather, Maj. Sinclair took it upon herself to improperly diagnose and determine Plaintiff's level of infirmity from afar.

31.     Maj. Sinclair's false and inappropriate personal "diagnosis" of Plaintiff's condition colored and prejudiced Maj. Sinclair against Plaintiff, and was a major factor in the abusive treatment Plaintiff was later subjected to.

32.     Ms. Weston requested medical assistance from the Occupational Health Reference and Referrals office for employees, stating that she had been injured, as she was required do.  She also complied with applicable policy by informing her supervisor of the incident.

33.      Maj. Sinclair refused to provide Ms. Weston the documentation she needed via the DOD medical system, so Plaintiff was forced to find her own medical assistance at an urgent care center.  At the urgent care center, Plaintiff was referred to an orthopedist for additional diagnosis and care.

34.     In January of 2020, Plaintiff submitted a worker's compensation claim related to her work-related injury.

35.     Defendant was aware of Plaintiff's worker's compensation claim because, in keeping with its pattern of attempting to harm Plaintiff, DOD decided to actively oppose Plaintiff's claim, which

in turn caused the Department of Labor (hereinafter "DOL") to have to issue a formal opinion on the matter.

36.     In March of 2020, after considering the evidence and arguments of both sides, the DOL sided with Plaintiff, who proceeded *pro se*, finding that Plaintiff was fully entitled to workers' compensation.

37.      Over Maj. Sinclair's objection, Ms. Weston went to an orthopedic surgeon, who examined her knee and determined that she had a major hematoma in her knee.  Her doctor was particularly concerned about the stability of her bone because Plaintiff is a bone cancer survivor, and had a bone graft near the location of the hematoma in her leg.   Neither Maj. Bailey nor Maj. Sinclair were aware of Plaintiff's medical history.

38.     Plaintiff's orthopedist gave her mobility restrictions due to the excessive amount of swelling in her knee, and his concerns about the stability of her bone.  He put her in a knee immobilizer and crutches.

39.     Per her doctor's orders, Plaintiff was limited to stand only intermittently, for no more than 2 hours per day, and was prohibited from walking for more than three (3) hours per day.  She was also restricted from kneeling, bending, stooping, twisting or pulling any substantial weight.

40.     Due to Plaintiff's injury, she was unable to work from approximately December 4, 2019, to February 18, 2020.  A doctor's note was provided to DOD from Plaintiff's medical provider to cover this period.

41.     On February 11, 2020, Plaintiff submitted her ***first*** ADA Reasonable Accommodation Request Form, seeking accommodation of her mobility challenges related to her still healing knee injury.

42.     The reasonable  accommodation she requested included a temporary change in duties, so that she could remain seated for most of the day.  She asked if she could serve in the patient advocate role, which allowed her to be seated and to work from a computer to execute her duties.

43.     Plaintiff's February 11, 2020, request for a reasonable accommodation was denied, and Plaintiff was told she had to report to work.

44.     On or about February 13, 2020, Plaintiff's health care provider submitted documentation in support of Ms. Weston's *second* request for a reasonable accommodation.   In that documentation, Plaintiff's provider recommended that Plaintiff work from home for least 8-12 weeks while also doing physical therapy.

45.     Despite this recommendation and request for accommodation, Maj. Sinclair denied Plaintiff the ability to work from home, and insisted that Plaintiff report to work in person.

46.     On or around February 18, 2020, Plaintiff returned to work, although she had to use crutches to move around the facility.  On that day, Plaintiff made a *third* request for a reasonable accommodation.

47.     On or about February 18, 2020, Maj. Sinclair requested medical documentation from Plaintiff regarding her physical therapy (PT) appointments. But rather than accede to the recommended accommodation, Maj. Sinclair only accommodated Plaintiff to the extent of removing her from the  Emergency Response Team (ERT).

48.     On or about March 9, 2020, Plaintiff had a follow-up appointment with her medical provider.  Based on his assessment of her progress, the medical provider instructed and prescribed that Plaintiff should telework until April 30, 2020.

49.     Later that day, on March 9, 2020, Plaintiff submitted her *fourth* request for a reasonable accomodation, supported by documentation from her provider to Maj. Sinclair.

50.     Again, Plaintiff was denied the reasonable accommodation recommended by her physician, and was not permitted to work from home.

51.     Despite Plaintiff making *four separate requests* for a reasonable short-term accommodation of her disability, management refused to engage in an interactive process with her, which unreasonably discounted and ignored documentation from Ms. Weston's healthcare provider in support of her request for accommodation.

52.     Throughout March of 2020, Plaintiff continued to attend her physical therapy appointments as recommended by her medical provider and orthopedic specialist.

53.     But in an inexplicable and punitive move, Maj. Sinclair and Maj. Bailey categorized all of the time Plaintiff was off from work as sick and/or annual leave, thus exhausting Plaintiff's leave reserve, instead of counting it as worker's compensation leave.

54.     This resulted in Plaintiff's appointments being categorized as absent without leave (AWOL) instead of being covered by her workers' compensation leave.

55.     On or about March 30, 2020, all of the department's RN's and employees were sent home to work remotely due to COVID-19.

56.     On or about March 31, 2020, Plaintiff was provided with a laptop to telework due to the pandemic. However, she was only allowed to work from home for two days.

57.     On or about April 2, 2022, Plaintiff was instructed by Maj. Sinclair and Maj. Bailey to come back into work because they believed she was carrying an insufficient workload. Plaintiff was then required to return her laptop.

58.     Although none of the other RN's had requested the ability to telework as a reasonable accommodation of a disability, they were all allowed to work remotely to avoid exposure to the coronavirus.

59.     Because of the racial and gender animus of Maj. Sinclair and Maj. Bailey, Ms. Weston was denied the ability to telework that was given to her colleagues.

60.     The reason provided by Maj. Sinclair and Maj. Bailey for the disparate treatment of Ms. Weston vis-à-vis her colleagues was pretext for discrimination.  Ms. Weston's workload for March was approximately 284 patient contacts. The other nurses had substantially lower productivity for that month, but were not required to return to the hospital, and were allowed to continue to telework.

61.     Plaintiff's workers compensation claim was approved in March of 2020, however, Defendant refused to compensate Plaintiff for the lost time related to her physical therapy appointments.

62.     On or about June 25, 2020, Plaintiff was issued a letter of leave restriction in which she was falsely accused of abusing leave from January 2020.

63.     The letter was not based in fact, inasmuch as Ms. Weston provided medical notes and letters from her medical provider related to her injury, her need for time off, as well as in support of her need for a reasonable accommodation.

64.     The letter was issued because Maj. Sinclair believed her own evaluation of the severity of Plaintiff's injury, over the evaluation of Plaintiff's treating physician, which was improper, biased, and profoundly prejudicial to Plaintiff.

65.     On or about December 8, 2020, Plaintiff was reassigned from the Pentagon Clinic to the Fort Belvoir Community Hospital Dental Clinic inside of the Pentagon (hereinafter "Dental Clinic"), which constituted a serious and impactful change to her duties and was punitive in nature. Even worse, Plaintiff was reassigned from Primary Care medicine, to serve as a front desk clerk in the Dental Clinic, a role that did not use any of her RN skills.

66.     Plaintiff was essentially demoted, and had her job duties taken away from her as both, retaliation for having filed an EEO complaint, and retaliation for seeking a reasonable accommodation under the ADA.

67.     On or about January 27, 2021, Plaintiff's patient care privileges were revoked, because she was falsely accused of clinical deficiencies, lack of clinical competence and substandard care.

68.     This was the first time in her entire career, that Plaintiff was accused of substandard patient care.

69.     After an investigation of the allegations against her, Plaintiff's privileges were reinstated by a cursory email from her supervisor.  Importantly, no apology or explanation was given for the defamatory and retaliatory action that was taken against Plaintiff.

70.     The retaliatory campaign against Plaintiff continued on or about July 20, 2021.  On that date, the credentialing committee reviewed recommendations submitted by Maj. Sinclair for Plaintiff's credentials to be removed for failure to properly triage or assess patient complaints, failure to complete clinical patient assessments, failure to ensure complete and comprehensive nursing documentation, failure to demonstrate or implement proper clinical interventions, decision and/or actions while providing patient care. The committee recommended a revocation of Privilege(s)/ Practice which was never enforced or even ruled upon.

71.     On or about January 5, 2022,  Plaintiff's medical provider supplied her with documentation that Plaintiff was receiving outpatient care at the Washington DC VA Medical Center (hereinafter "VA Center") for stress, anxiety, depression and sleeplessness due to the ongoing and extreme retaliation she was enduring at work.

72.      Plaintiff's medical provider indicated that Plaintiff was experiencing clinically significant anxiety symptoms, which had been further exacerbated by her workplace stress, and advised that

13

Ms. Weston telework indefinitely. This was the *fifth* request for a reasonable accommodation submitted by Plaintiff.

73.    Maj. Sinclair, Maj. Bailey, and Lt. Colonel Escueta ignored the request. Instead, they continued to harass Plaintiff regarding her charts and patient notes from 2020.

74.    In order to manufacture a reason to terminate Plaintiff, Maj. Sinclair, Maj. Bailey and Lt. Col. Escueta falsified and manipulated documents to make Plaintiff look derelict in her patient work. Plaintiff maintained copies of the original files, and is able to demonstrate the falsification and manipulation that was designed to defame her and take Plaintiff's credentials from her.

75.    Plaintiff received a summons for Jury Service for the dates of January 14, 2022, to Friday January 28, 2022.

76.    On or about May 5, 2022, Plaintiff received a Notice of Proposed Removal from her current position of Nurse (Clinical) GS-0610-11 within 30 days. The charges were for lack of candor  and failure to adhere to established leave policies.

77.    The records submitted by Plaintiff showed that she was summoned for jury duty and in compliance with the provided summons for Petit Jury Services. Plaintiff properly submitted the summons to Major Eric Graybill (hereinafter "Maj. Graybill").

78.    During the summons period, Plaintiff was not selected to sit on a jury or as a juror during a trial, but remained as a summoned juror from January 14 - January 28, 2022.

79.    On or about April 7, 2022, Captain Rachel Schlink (hereinafter "Cpt. Schlink") informed Plaintiff that she would like to discuss the jury summons that reflected the dates of January 18-29.

80.    On or about April 19, 2022, Capt. Schlink received a note from Plaintiff's medical provider that excused Plaintiff from work  from January 14 – 28, 2022. The medical note Plaintiff provided was properly verified and certified on or about April 27, 2022.

81.    In essence, at the time that Plaintiff was supposed to be on jury duty, she was also off on sick leave due to the stress she was enduring at work, which was supported by a note from Plaintiff's treating physician.

82.    Plaintiff was not selected for jury duty, but she remained out from work, in accordance with her doctor's note and sick leave.

83.    In furtherance of the scheme to harm Plaintiff, Defendant used the fact that Plaintiff was out on sick leave, but had initially indicated she would be out for jury duty, as a basis to terminate her employment.

84.    Despite being provided with paperwork and certified medical documentation for the January 14 -28 period, Defendant nevertheless chose to remove Plaintiff from her employment.

85.    Plaintiff's termination was the result and culmination of a two-year long campaign to attack, defame, bully, harass and undermine Plaintiff because of her race, gender and protected activities.

86.    After a twenty-year career with DOD, Plaintiff was summarily dismissed for a transgression that the Union Representative admitted had never before formed the basis of a termination.


## CLAIMS

### COUNT I

(Violation of the Civil Rights Act of 1967,
42 U.S.C. § 2000e *et seq.*—Disparate Treatment and Hostile Work
Environment Based on Race)

87.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

88.    Because of her race, Plaintiff, the only Black nurse assigned to all of the Executive Medicine organization for the National Capitol Region of the Department of Defense medical services, was summarily removed from her position by Maj. Bailey.

89.    The reason provided to Plaintiff for removal from her position, the desire to rotate nurses, proved to be pretextual because no other nurses in the program were rotated out.

90.    Because of her race, Plaintiff was targeted by Maj. Bailey and Maj. Sinclair for a campaign of harassment, disparate treatment, unfair and false accusations, demotions, unjustified reassignments and ultimately, termination.

91.    Because of her race, Plaintiff was disbelieved by Maj. Sinclair when she reported her serious knee injury and the need for time off to recuperate and rehabilitate the injury.

92.    Because of her race, Maj. Sinclair and Maj. Bailey repeatedly refused to abide by ADA protocols, denied Plaintiff's repeated requests for reasonable accomodation, and failed to take seriously her need to remain off of her feet in order to heal more efficiently.

93.    Because of her race, Maj. Sinclair and Maj. Bailey removed Plaintiff from her charge nurse duties, falsely accused her of lack of productivity and transferred her to the Dental Unit, where she was tasked as a desk clerk.

94.    Because of her race, Maj. Sinclair, Maj. Bailey and Lt. Col. Escueta collaborated to manufacture reasons to censure and undermine Plaintiff, and ultimately to terminate her employment.

95.    The reasons given by Defendant for Plaintiff's termination are pretext for discrimination.

96.    As a direct and proximate cause of the bullying, harassment, disparate and unfair treatment she was subjected to, Plaintiff suffered such severe emotional distress that she had to seek medical

care, and her health care provider diagnosed her with a disability in need of a reasonable accommodation.

97.     Plaintiff is entitled to a remedy, and herein seeks compensatory damages of not less than $300,000.00, plus costs, fees, interest, attorneys fees, and all other remedies deemed appropriate by this Court.

## COUNT II

(Violations of the Civil Rights Act of 1967,
42 U.S.C. § 2000e *et seq.*—Disparate Treatment and Hostile Work
Environment Based on Gender)

98.     Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

99.     Because Defendant has a particular contempt for Black women, Plaintiff was subjected to a hostile work environment, disparate treatment vis-à-vis her male colleagues, adverse employment actions, and retaliation when she complained of the treatment she was subjected to.

100.    Because of Defendant's hostility towards Black women, Plaintiff's multiple internal complaints, and her formal EEO Complaint regarding the way she was being treated were ignored.

101.    Plaintiff specifically alleges that similarly situated male employees had their complaints responded to quickly, and their concerns taken seriously. However, Plaintiff was not treated in the same manner.

102.    As a direct and proximate cause of the bullying, harassment, disparate and unfair treatment she was subjected to, Plaintiff suffered such severe emotional distress that she was required to seek medical care, and her health care provider diagnosed her with a disability in need of a reasonable accommodation.

103.    Plaintiff herein seeks compensatory damages of not less than $300,000.00, plus costs, fees, interest, attorneys fees, and all other remedies deemed appropriate by this Court.

## COUNT III

(Violation  of the Civil Rights Act of 1967,
42 U.S.C. § 2000e *et seq.*-- Retaliation)

104.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

105.    Plaintiff was the only Black nurse in the department in which she worked.

106.    In 2018, Maj. Bailey removed Plaintiff from the EMT because of her race.  He had no other basis to remove her, and his excuse that he was rotating nurses out, did not bear out with respect to any other nurses.

107.    Maj. Bailey made statements that reflected his racial animus and bias against Plaintiff.

108.    When Plaintiff complained about the transfer out of the EMT, her complaints were ignored by management.

109.    In November of 2019, Plaintiff engaged in protected activity by filing an EEO complaint, alleging race and gender discrimination based on disparate treatment, a hostile work environment due to her race and gender, and retaliation.

110.    Defendant was aware of Plaintiff's EEO complaint, as were Maj. Bailey, Maj. Sinclair and Lt. Col. Escueta.

111.    Because Plaintiff engaged in protected activity, Defendant targeted her for adverse employment actions, including but not limited to, assigning her to a desk clerk job in the Dental clinic, falsely accusing her of misconduct, targeting her for excessive discipline, refusing to accommodate her disability, and eventually terminating her employment under false pretenses.

112.    Plaintiff asserts that Defendant targeted her for retaliatory action because she accused her superiors of race and gender discrimination.

113.    As a direct and proximate cause of the unfair treatment and adverse action she was subjected to, Plaintiff suffered such severe emotional distress that she was required to seek medical care, and her health care provider diagnosed her with a disability in need of a reasonable accommodation.

114.    Plaintiff herein seeks compensatory damages of not less than $300,000.00, plus costs, fees, interest, attorneys fees, and all other remedies deemed appropriate by this Court.

## COUNT IV

(Violation of the Americans With Disabilities Act
28 U.S.C. §12111--Failure to Accommodate a Disability)

115.    Plaintiff references and incorporates all the factual allegations in the previous paragraphs as if fully restated herein.

116.    Plaintiff is a qualified person, who, due to a fall, suffered an injury that rendered her temporarily disabled.

117.    Plaintiff is a qualified person, who, due to severe stress and anxiety related to her work conditions, developed a condition and disability that required a reasonable accommodation.

118.    Despite providing documentation of the need for a disability, on each of five separate occasions, Defendant refused to consider her request for an accommodation.

119.    Plaintiff asserts that on *five separate occasions* as outlined herein, Defendant failed to engage in an interactive process with Plaintiff or her health care provider to ascertain how best to accommodate Plaintiff's disability.

120.    The accommodation that Plaintiff was seeking was eminently reasonable, and Defendant showed that they had the ability to provide Plaintiff's requested reasonable accommodation, but chose not to do so.

121.    Defendant's refusal to provide Plaintiff a reasonable accommodation is without justification or excuse.

122.    As result of Defendant's refusal to accommodate Plaintiff's disability, Plaintiff was unable to have proper time to recover and had to exhaust her annual leave and sick leave in order to continue receiving treatments. When this leave was exhausted management then improperly assigned AWOL status to physical therapy absences, and used this false characterization as a justification for Plaintiff's termination.

123.    As a direct and proximate cause of Defendant's refusal to accommodate Plaintiff's disabilities, Plaintiff suffered severe mental and emotional anguish of a nature and duration that is both actionable and compensable.

124.    In recompense for the five occasions in which Defendant intentionally and unjustifiably refused to accommodate Plaintiff's disability, Plaintiff seeks compensatory damages of not less than $500,000.00, as well as fees, costs, interest, attorneys fees and all other remedies this Court deems appropriate.


### COUNT V

(Violation of the Americans With Disabilities Act
28 U.S.C. §12111--Retaliation for
Seeking a Reasonable Accommodation)

20

125.    Plaintiff references and incorporates the factual allegations in the previous paragraph as if fully restated herein.

126.    Plaintiff reasserts that she is a person with a disability who asked her employer for a reasonable accommodation of her disability.

127.    Defendant refused to provide Plaintiff with an accommodation and refused to engage in an interactive process with Plaintiff regarding her need for an accommodation.

128.    Plaintiff sought Worker Compensation to manage her medical bills and leave.

129.    Defendant was informed that Plaintiff had received Workers Compensation from the Department of Labor and thus was able to receive comp leave and her employer was required to provide reasonable accommodations due to injury.

130.    Rather than provide Plaintiff with the proper leave code Defendant had Plaintiff's records reflect that she was AWOL.

131.     Defendant retaliated against Plaintiff for seeking a reasonable accommodation by changing her records to AWOL, reassigning her to improper detail, and falsely accusing her of improper actions, and not following the proper care standards, and used said retaliation as justification for termination of her employment, which constitutes an adverse employment action.

132.    As a direct proximate cause of Defendant's action, Plaintiff suffered damages including loss of income, damage to reputation, mental and emotional stress and anguish, and stress and anxiety that contributed to the degeneration of her physical health.

133.    Plaintiff thus seeks front pay, back pay, lost benefits, interest, costs and attorney's fees in an amount of not less than $100,000, as well as any additional remedy that the Court deems appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

a.  Award Plaintiff a financial remedy of not less than $1,500,000.00.

b.  Provide Plaintiff with applicable backpay, benefits and interest;

c.  Order expungement of Plaintiff's employment record to ensure that it is devoid of any adverse/negative personnel actions/record including all adverse negative performance appraisals, disciplinary records and substitute accurate agency records related to Plaintiff;

d.  Reimburse Plaintiff for all sick and annual leave she was forced use to due to Defendant not providing her with proper comp time;

e.  Award Plaintiff reasonable attorney's fees and costs;

f.  Award such other and further relief as this Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on claims so triable.

Respectfully submitted,

/s/Pamela M. Keith
Pamela M. Keith [Bar No. 448421]
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiff*